**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELIZABETH BEST, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>SECOND NATURE BRANDS, INC., *et al.*,<br><br>     Defendants. | Case No. 24-cv-1799 (JMC) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

When a group of renters signed a lease to move into a new property, the property manager automatically enrolled them in—and began charging them a monthly fee for—a "Resident Benefits Package." That package included, among other things, what the property manager and the company that created the benefits package called "renter's insurance." When the property burned down a few months after the renters moved in and destroyed their belongings, the renters discovered that their "renter's insurance" policy only offered them $10,000 of coverage but offered the landlord and owner significantly more protection. Left holding the bag for most of their losses, the renters filed this lawsuit. They allege that the property manager, the company that created the "Resident Benefits Package," and the company that provided the insurance policy all violated a provision of D.C.'s Rental Housing Act that prohibits the imposition of "mandatory fee[s]" in rent stabilized housing absent approval as laid out in the Act. D.C. Code § 42-3502.11a. They also allege the defendants violated D.C.'s Consumer Protection Procedures Act, both by violating that Rental Housing Act provision and a separate insurance law, and by misleading consumers.

The first of those claims fails. The Rental Housing Act does not provide the renters with a cause of action to file a complaint directly under that statute in a court. Instead, it creates an

1

administrative scheme through which the renters could have—but did not—press this claim. In the end, though, that conclusion does not much change the course of this litigation. That's because the Consumer Protection Procedures Act provides the renters with a cause of action to "seek[] relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(A). Via that provision, the renters can press their claim that automatically enrolling them in the "Resident Benefits Package" violated the Rental Housing Act.

On the merits, the renters have plausibly alleged that the property management company and its owner violated the Rental Housing Act. They have not, however, stated a claim for a violation of that statute against the other defendants in this case. The same goes for the renters' claim that the defendants unlawfully sold insurance without a license, thereby violating the Consumer Protection Procedures Act. That claim is plausible against the property management company and its owner, but not against the other defendants. Finally, aspects of the remaining Consumer Protection Procedures Act claims—which turn on the allegedly misleading statements and omissions made by each of the defendants—are plausible. The Court therefore **DENIES IN PART** and **GRANTS IN PART** all three motions to dismiss.[1]

## I.     BACKGROUND

Elisabeth Best, Jenna Bucklew, Rachel Irias, and Cassandra Stephan—the four plaintiffs in this case—applied to rent a property in Northwest D.C. *See* ECF 24 ¶¶ 6, 36. The property manager—Columbia Property Management, one of the defendants here—almost immediately "conditionally approved" their application. *Id.* ¶ 38. When it notified the renters that they were conditionally approved, Columbia also provided them with a flyer describing a "Resident Benefits

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

Package." *Id.* The flyer included at the top the words "rbp" (apparently an acronym for "Resident Benefits Package") "by second nature." *Id.* That notation reflected the origins of the "Resident Benefits Package." The package was "creat[ed]" by a company called Second Nature—a defendant here via two corporate entities that were sued, but that the Court will refer to collectively as Second Nature—and marketed to property managers as a way to create "ancillary revenue."[2] *Id.* ¶¶ 24–25. Ancillary revenue, Second Nature explained on its website, is "income generated by a property that is not directly related to its primary function or purpose." *Id.* ¶ 25. "Examples . . . can include things like pet fees, renter's insurance programs, management fees, and more." *Id.*

The flyer that Columbia provided the renters described the particular "[b]enefits" of Second Nature's "Resident Benefits Package." ECF 24 ¶ 38. Those included "credit building"— meaning Columbia would "report every rent payment so [renters could] build credit"—a "move-in concierge," and "renters insurance." *Id.* Because the renter's insurance plays a crucial role in this case, it is worth quoting in full what the flyer had to say about that benefit: "We've secured the industry-leading value policy from an A-rated carrier. You'll benefit by being added to our master policy so all of your insurance requirements in the lease are met. If you want a retail individual policy, you can still get that at any time." *Id.*

The renters were promptly given full approval to rent the property and Columbia sent them the lease via an electronic signature program. *See* ECF 24 ¶¶ 40–41. In "the body of the email" it sent the renters about signing the lease, Columbia told them it had "drafted th[e] lease along with the Resident Benefit Packet Addendum" for the renters' "review and signature." *Id.* ¶ 41. The renters claim that the addendum was not, in fact, attached. *Id.* Nevertheless, the renters signed the lease, and Columbia's owner—Scott Bloom, also a defendant here—countersigned it on behalf of

---

[2] The named defendants are Second Nature Insurance Services, LLC, and Second Nature Brands Inc. ECF 24 ¶ 2.

the landlord. *See id.* ¶ 42; *see also* ECF 26 at 11 (describing Bloom as Columbia's owner). Upon the renters' signing of the lease, Columbia "automatically enrolled" the renters in the "Resident Benefits Package." ECF 24 ¶ 6. The renters were then charged a monthly fee of $45.95 for the package, as well as a "service fee of $2.95." *Id.* ¶ 44.

Unfortunately, there was a fire at the property a few months after the renters moved in. *See* ECF 24 ¶ 46. The renters' belongings were "destroyed," and they were left "without a place to live." *Id.* The next day, the renters "attempted to open an insurance claim with Columbia" based on the renter's insurance "included as part of the Resident Benefits Package." *Id.* ¶ 47. Columbia redirected the renters to Second Nature. *See id.* "This [was] the first" time the renters had "learned of Second Nature's involvement with respect to" the renter's insurance. *Id.* Second Nature then told the renters that their claim "had been submitted to the carrier" and further "redirected" them to send any "questions to QBE Claims." *Id.* As it turns out, QBE Specialty Insurance Company—the final defendant to be introduced—"provided the insurance policy to Second Nature" that was then offered as part of the "Resident Benefits Package." *Id.* ¶ 18.

Eventually, the renters received a copy of their policy and "learned that it was actually a 'Property Manager and Landlord Protection Policy,' which primarily provided coverage for the Landlord and Columbia." ECF 24 ¶ 50. "The insured listed on the policy was not one of the" renters, "but instead Second Nature." *Id.* The policy "only provided $10,000 of coverage for all four" of the renters combined, so $2,500 per individual. *Id.* The policy provided "property damage coverage to the" property owner and Columbia, by contrast, of $100,000, "as well as loss of rental income." *Id.* The renters apparently received their $10,000, but "their personal property damage collectively exceeded $100,000." *Id.* ¶ 7. Because the renters believed that they had renter's

4

insurance "as part of the Resident Benefits Package," they had "not obtain[ed] separate renter's insurance to cover" the full value "of their personal belongings." *Id.*

Aggrieved by this allegedly "fraudulent and unlawful" "scheme," the renters filed this putative class action lawsuit. ECF 24 ¶¶ 1–2. In a two-count complaint, the renters allege violations of the D.C. Rental Housing Act and Consumer Protection Procedures Act (CPPA). *See id.* at 27, 29. The Rental Housing Act claim turns on the allegedly unlawful imposition of a "mandatory fee for a service" that "has not been approved" as required under the rent stabilization subchapter of the Act. *Id.* ¶ 61 (quoting D.C. Code § 42-3502.11a). The CPPA claim can be subdivided into three subsidiary claims: 1) that the violation of the Rental Housing Act was also a per se violation of the CPPA; 2) that selling insurance without a license violates another D.C. statute, which in turn is a per se violation of the CPPA; and 3) that the defendants made myriad "misrepresentations" and "omissions of material fact" in violation of the CPPA. *Id.* ¶¶ 67–68.

The renters filed the case in the Superior Court of the District of Columbia, but the defendants removed it to this Court. *See* ECF 2-1. Because the renters filed their case as a putative class action, the defendants premised removal on the Class Action Fairness Act, which grants federal courts jurisdiction over certain class actions. *See id.* ¶ 3. After the renters filed an amended complaint in this Court, *see* ECF 24, the defendants filed three separate motions to dismiss—one on behalf of Columbia and Bloom, another on behalf of Second Nature, and a third by QBE. *See* ECF 26; ECF 27; ECF 28. Those motions raise many overlapping issues, but there are a handful of arguments that are particular to the respective defendants.

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The

Court must "treat the complaint's factual allegations as true" and afford the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). That said, the Court "need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the [C]ourt accept legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). The ultimate question is whether the complaint "plead[s] factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III.    ANALYSIS

The Court begins by assuring itself of its jurisdiction. Satisfied that the Class Action Fairness Act grants it subject matter jurisdiction and that the renters have standing to press nearly all of the claims in their complaint, the Court then turns to the merits. In the first count of their complaint, the renters bring a claim directly under the Rental Housing Act, alleging the defendants violated the provision of the Act that prohibits the imposition of "mandatory fee[s] for any service" absent approval via the process applicable to rent controlled housing. D.C. Code § 42-3502.11a; *see* ECF 24 ¶ 61. Because the Rental Housing Act does not provide a cause of action to directly enforce this provision in a court—instead creating a scheme of administrative proceedings followed by judicial review and, if needed, enforcement—the Court dismisses this claim.

But because the CPPA provides the renters with a cause of action to seek redress for "trade practice[s]" that "violat[e] . . . a law of the District," D.C. Code § 28-3905(k)(1)(A), the Court concludes that, via count two of their complaint, the renters can nonetheless challenge the allegedly unlawful imposition of the mandatory fee. And the renters have plausibly alleged that Columbia and Bloom violated the CPPA by charging them a mandatory fee. That is not true, however, of

Second Nature or QBE: The complaint does not allege that either of those defendants imposed any fee at all. As for the allegedly unlawful sale of insurance, the same is true. That claim is plausible against Columbia and Bloom, but not against Second Nature or QBE. Finally, the complaint plausibly alleges that all defendants made misleading statements or omissions. The Court does conclude, however, that some of the challenged statements are not actionable.

**A.   This Court has jurisdiction over most of the renters' claims.**

"An action may be removed to federal court when it could have been brought originally in federal court." *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 148 (D.C. Cir. 2023). No one contests that the case could have been originally brought here under the Class Action Fairness Act's grant of subject matter jurisdiction. *See* ECF 24 ¶ 8 (complaint relying on 28 U.S.C. § 1332(d) for jurisdiction). Nevertheless, the Court has "an independent obligation" to ensure that it has jurisdiction over a removed case, so it quickly confirms at the outset that the Class Action Fairness Act's grant of jurisdiction applies. *Shah v. Saxena*, No. 23-cv-3127, 2025 WL 1865034, at *7 (D.D.C. July 7, 2025); *see also* 28 U.S.C. § 1447(c). The Court then addresses the jurisdictional argument the defendants have made: that the renters lack standing to press some of their claims. *See* ECF 27-1 at 25; ECF 28-1 at 29. The Court largely rejects that argument. The defendants are right, however, that the renters do not have standing to challenge any allegedly misleading statements made on Second Nature's website. Because the renters nowhere allege they ever visited that site, they cannot trace any supposed injuries to statements on the website.

**1.   The Class Action Fairness Act gives the Court subject matter jurisdiction.**

Because the renters and two of the defendants—Columbia and Bloom—are residents of the District of Columbia, *see* ECF 24 ¶¶ 11–14, 19–20, the case could not be removed based on the "principal federal statute governing diversity jurisdiction." *Lincoln Prop. Co. v. Roche*,

546 U.S. 81, 89–90 (2005) (describing complete diversity rule and removal statute's "bar[]" on "removal on the basis of diversity if any party . . . served as a defendant is a citizen of the State in which the action is brought"); *see* 28 U.S.C. § 1441(b)(2). The Class Action Fairness Act (CAFA), however, requires only that the parties be "minimally diverse." *Doe v. Georgetown Synagogue-Kesher Israel Congregation*, 118 F. Supp. 3d 88, 92 (D.D.C. 2015). Under CAFA, "district courts . . . have original jurisdiction" so long as, among other things, "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). That requirement is easily satisfied. Best is a resident of the District of Columbia, and Second Nature is incorporated in Delaware with its principal place of business in North Carolina. *See* ECF 24 ¶¶ 11, 15. Because CAFA's other jurisdictional requirements are also satisfied, the Court has jurisdiction under the statute. *See id.* ¶¶ 53, 81 (describing class size and damages sought); ECF 1-3 at 2 (listing demand as $60,000,000).[3]

There is one small quirk worth a mention. What is known as CAFA's "local controversy exception" seems like it might plausibly apply here. *McMullen v. Synchrony Bank*, 128 F. Supp. 3d 180, 182 (D.D.C. 2015) (discussing 28 U.S.C. § 1332(d)(4)). Almost certainly more "than two-thirds of the members of all proposed plaintiff classes in the aggregate" are citizens of the District

---

[3] The complaint seeks $1,500 "per violation of the CPPA" and alleges at least 19 violations of the Act. ECF 24 ¶¶ 68(a)–(s), 80; *see* D.C. Code § 28-3905(k)(2)(A)(i) (authorizing at least $1,500 per violation in statutory damages). That amounts to $28,500 in damages per consumer sent the flyer and enrolled in the Resident Benefits Package. The complaint alleges that Columbia manages at least 100 properties. *See* ECF 24 ¶ 53. Many of those likely have more than one tenant—the property in this case had four. Assuming an average of one-and-a-half tenants per property—which strikes the Court as a low-end estimate—there are at least 150 consumers in the class. That almost certainly understates the number, because it does not include the class of tenants living in properties that are not managed by Columbia but who were also enrolled in Second Nature's Resident Benefits Package. *See id.* ¶ 52(b) (describing this subclass). On the low end, then, the class is seeking at least $4,275,000 in statutory damages just for violations of the CPPA. Add to that the "treble damages" on count one, "reasonable attorney's fees," and punitive damages—all of which D.C. law allows—and the class satisfies CAFA's $5,000,000 amount in controversy requirement. D.C. Code §§ 42.3502.11a(b), 28-3905(k)(2)(B)–(C); ECF 24 ¶¶ 65, 81 (seeking this relief); 28 U.S.C. § 1332(d)(2); *see Neale v. Volvo Cars of N.A., LLC*, 794 F.3d 353, 357 n.1 (3d Cir. 2015) (explaining that where attorney's fees and punitive damages are recoverable under statute, they count for purposes of CAFA amount in controversy requirement); *Zuckman v. Monster Beverage Corp.*, 958 F. Supp. 2d 293, 301 (D.D.C. 2013) ("Attorney fees are part of the amount in controversy requirement if they are provided for by statute or contract.").

of Columbia—the classes only include "tenants in the District of Columbia." 28 U.S.C. § 1332(d)(4)(A)(i)(I); ECF 24 ¶ 52. The class is seeking "significant relief" from at least one defendant—two, actually, both Columbia and Bloom—"whose alleged conduct forms a significant basis for the claims asserted" and who is also "a citizen of" the District of Columbia. 28 U.S.C. § 1332(d)(4)(A)(i)(II). And the proposed classes' "principal injuries" occurred in the District of Columbia, too. *Id.* § 1332(d)(4)(A)(i)(III). If all of that is right, the "local controversy exception" would apply. *McMullen*, 128 F. Supp. 3d at 182.

Nevertheless, the non-applicability of that exception has been "uniformly interpreted . . . as not being [a] *prima facie* element[] of federal subject matter jurisdiction." 2 Newberg & Rubenstein on Class Actions § 6:19 & n.18 (6th ed. 2025) (collecting cases). In other words, even where the local controversy exception applies, a federal court is not "divest[ed] . . . of jurisdiction." *Reece v. AES Corp.*, 638 F. App'x 755, 767 (10th Cir. 2016). Because the exception is "not jurisdictional" but instead is akin to a "form of abstention," *Adams v. W. Marine Prods., Inc.*, 958 F.3d 1216, 1223 (9th Cir. 2020), its applicability is subject to the ordinary rules of waiver and forfeiture, *see Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1139 n.1 (9th Cir. 2013); *see also Hentif v. Obama*, 733 F.3d 1243, 1245 (D.C. Cir. 2013) (noting that parties can waive objections "to procedural defects to the extent they are not jurisdictional"). Because the renters have not only failed to argue that the local controversy exception applies but have affirmatively relied on CAFA to invoke this Court's jurisdiction, *see* ECF 24 ¶ 8, the Court need not decide whether the local controversy exception applies. Instead, it is satisfied that the jurisdictional elements of CAFA are satisfied.

9

**2.   The renters have standing to press nearly all of their claims.**

Although all agree that the Court has subject matter jurisdiction via CAFA, some of the defendants argue that the renters lack Article III standing to press some—but not all—of their claims. *See* ECF 27-1 at 25; ECF 28-1 at 29. No defendant argues the renters lack standing to pursue count one. And for good reason. In that claim, the renters allege they were "charged" a fee that the law prohibits. ECF 24 ¶¶ 44, 62. That "sort of pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021). The renters' financial loss is traceable to the defendants' alleged unlawful conduct—imposing the fee—and would be redressed by an award of damages, which is what the renters seek. *See* ECF 24 ¶ 81.

The defendants do, however, put up a fight about the renters' standing to press their second claim. To hear the defendants tell it, the renters only have standing to press this claim if they were "actually misled and relied upon" the defendants' "alleged misrepresentations," and the renters have not alleged any facts that plausibly give rise to that conclusion. ECF 27-1 at 26; *see also* ECF 28-1 at 31. That argument largely misses the mark for two reasons.

First, it ignores a significant chunk of the renters' second claim. The renters allege that the defendants violated the CPPA by, among other things, imposing the fee for the Resident Benefits Package in violation of the Rental Housing Act and selling them the renter's insurance "without a license to do so." ECF 24 ¶ 67. Both of those theories run through precisely the same standing analysis as the first claim: Because of the defendants' allegedly unlawful conduct, the renters were "charged" for the Resident Benefits Package and its insurance offering. For the same reason that theory of standing suffices for count one, it suffices for these aspects of count two.

Second, the renters have standing to press nearly all of their CPPA claims that turn on the defendants' alleged misrepresentations and omissions. The complaint alleges that had the renters

been accurately informed about the "benefits" offered in the Resident Benefits Package—particularly the insurance policy's coverage limits—they either "would not have rented the" property or "would have obtained a separate insurance policy to ensure they were adequately insured." ECF 24 ¶¶ 73, 75. "Where, as here, plaintiffs . . . contend" that because of misleading advertising "they paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so[,] they have suffered an Article III injury in fact." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1145 (9th Cir. 2024); *see also POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014) ("A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III.").

That theory is particularly compelling in this case, given the renters' allegation that the defendants concealed the insurance policy's limited coverage by deceptively labeling it as "renter's insurance" and failing to provide the renters with a copy of the policy. *See* ECF 24 ¶ 68(n)–(q). Even if the renters might have gone forward with leasing the property had they known about the policy's $10,000 limit, it is certainly plausible to think that had they known the true facts they would have "ensure[d] they were adequately insured" by purchasing an additional renter's insurance policy with higher limits. *Id.* ¶ 75. Had the renters done so, they could have avoided more than $90,000 in losses. *See id.* ¶ 7. Those allegations establish standing to press these claims.

In arguing otherwise, the defendants repeatedly fail to "assume" for the purposes of assessing standing "that on the merits the [renters will] be successful in their claims." *Tanner-Brown v. Haaland*, 105 F.4th 437, 444 (D.C. Cir. 2024). They argue, for instance, that none of the "statements" that were made to the renters "about the insurance" were "false." ECF 27-1 at 27. If the defendants are right about that, they will defeat this claim on the merits. But for standing purposes, the Court assumes the opposite.

The same issue runs through the defendants' argument that the renters lack standing because they "allege that they were not provided with any information about the Resident Benefits Package or its services" and therefore could not have relied on the defendants' alleged misrepresentations. *Id.* at 26. That ignores that the renters claim they were materially misled by the defendants' omissions. *See, e.g.*, ECF 24 ¶ 68(o)–(s). The Court assumes the renters will prevail on that claim, too, and if they do, the failure to provide information will have harmed the renters no differently than would have the affirmative provision of false information. *See McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 706–07 (9th Cir. 2020) (describing cases holding that "non-disclosure[]" leading to economic injury constitutes a cognizable injury). In any event, the renters do allege that the defendants affirmatively provided them with misleading information—the Resident Benefits Package flyer. *See* ECF 24 ¶ 38.

QBE, for its part, argues that the renters at least lack standing to bring this claim against it because there are no allegations that QBE "made affirmative misrepresentations." ECF 28-1 at 30. But—again, the Court assumes for standing purposes they are right about this—the renters' theory is that QBE is responsible for Second Nature and Columbia's statements because the defendants were in a joint venture or some form of agency relationship. *See* ECF 24 ¶¶ 17, 21. The Court will return to many of these issues when it arrives at the merits, but the renters' allegations and theory of liability are sufficient at this stage to satisfy Article III's requirements for most of their claims.

The one exception is for any claims that arise out of allegedly misleading statements Second Nature made on its website. *See* ECF 24 ¶¶ 24–26. Nowhere in their complaint do the renters allege they ever saw that website. They therefore have not alleged that they were "misled by any of [the claimed] misrepresentations" on the website and lack standing to challenge those statements. *Woodford v. Yazam Inc.*, No. 22-cv-3665, 2023 WL 8083975, at *5 (D.D.C. Nov. 21,

12

2023). It is not entirely clear which of the long list of supposedly misleading statements in the renters' complaint are drawn from that website, but it appears that at the very least Second Nature's assurance that it has "got you covered" because its "renter's insurance program ensures 100% compliance and liability coverage protecting you, your property investors, and your residents" was made only on the website, given that it appears nowhere in the flyer the renters were sent. *Compare* ECF 24 ¶ 68(b), *with id.* ¶ 38. The renters lack standing to challenge that and any other statements that were made only on Second Nature's website.

**B. Under D.C. law, the Rent Administrator and Rental Housing Commission have primary jurisdiction over the renters' claim under the Rental Housing Act.**

The renters' first claim is that they were charged a "mandatory fee" for a "service"—the Resident Benefits Package—that "ha[d] not been approved" via the procedures that apply to rent stabilized housing in the District of Columbia. ECF 24 ¶¶ 61–62. That, the renters allege, violated section 11a of the Rental Housing Act's subchapter on rent stabilized housing. *See* D.C. Code § 42-3502.11a. And in their first count, they seek to redress that violation by bringing a cause of action directly under the Rental Housing Act. *See* ECF 24 ¶¶ 61–63.

Under D.C. law, there is an agency with "special competence" in administering the rent stabilization laws: the Rental Housing Commission and the related Rent Administrator. *Drayton v. Poretsky Mgmt., Inc.*, 462 A.2d 1115, 1118 (D.C. 1983); *see* D.C. Code §§ 42-3502.01, .04. The Commission has the "sole authority to issue, amend, and rescind rules and procedures for the administration" of the rental housing chapter of the Rental Housing Act and is tasked with "[d]ecid[ing] appeals . . . from decisions of the Rent Administrator." D.C. Code § 42-3502.02(a)(1)–(2). The Rent Administrator, for her part, has "jurisdiction over . . . complaints and petitions arising under" several subchapters of the Rental Housing Act, including the rent stabilized housing subchapter. *Id.* § 42-3502.04(c). Exercising that jurisdiction, the Rent

13

Administrator can hear petitions filed by tenants and impose penalties for violations of the rent stabilization laws. *See* D.C. Mun. Regs. Tit. 14, § 4214.1; D.C. Code § 42-3509.01. These are just some of the Rent Administrator and Rental Housing Commission's responsibilities. *See also, e.g.*, D.C. Code § 42-3502.16 (providing procedure for reviewing rent adjustments); *id.* § 42-3502.24(f) (requiring Rent Administrator to take certain actions with regard to elderly tenants and tenants with disabilities).

This "regulatory scheme" assigns "resolution of issues" under the rent stabilized housing laws to these "administrative bod[ies]" with "special competence." *Drayton*, 462 A.2d at 1118. For that reason, the D.C. Court of Appeals has held that the Rent Administrator and Rental Housing Commission have "primary jurisdiction" over disputes arising under the rent stabilization subchapter. *Id.* at 1117. That conclusion reflects one aspect of D.C.'s "substantive law," and this Court is therefore bound to follow the Court of Appeals' holding. *Lockhart v. Coastal Int'l Sec., Inc.*, 905 F. Supp. 2d 105, 115 n.9 (D.D.C. 2012); *see also* Wright & Miller, 19 Fed. Prac. & Proc. Juris. § 4511.1 n.61 (3d ed. 2025) (collecting cases holding that state law administrative exhaustion requirements are substantive law for *Erie* purposes). Because these agencies have "primary jurisdiction" and there is nothing in the Rental Housing Act suggesting the renters could bring a claim directly under that Act—as they attempt to do here—the renters lack "an independent cause of action" for count one of their complaint. *Am. Fed'n of Gov't Empls. v. D.C. Water & Sewer Auth.*, 942 A.2d 1108, 1110, 1113 (D.C. 2007).[4]

---

[4] Second Nature argues that under D.C. law the requirement of pressing this claim before the Rent Administrator and Rental Housing Commission is of jurisdictional consequence, requiring this Court to dismiss count one under Rule 12(b)(1) for lack of jurisdiction. *See* ECF 27-1 at 13; *but see Am. Fed'n of Gov't Emps.*, 942 A.2d at 1112 n.3 (explaining that a "failure to exhaust administrative remedies does not deprive the trial court of subject matter jurisdiction" in a way that suggests the primary jurisdiction doctrine, despite its name, might not be of jurisdictional moment). That argument presents thorny questions. The proposition that a state's substantive law can limit the "jurisdiction of *federal* courts" raises some doubts. *Anthology, Inc. v. Tarrant Cnty. College Dist.*, 136 F.4th 549, 553 (5th Cir. 2025) (holding that "*state-law* immunities . . . cannot limit the jurisdiction of *federal* courts"); *see also*

The renters make three attempts to avoid this conclusion. First, they rely on a "remedy" provision found in the rent stabilized housing subchapter to insist that they can "file an action directly in the Superior Court of the District of Columbia" to enforce section 11a—which is precisely what they did before this case was removed to federal court. ECF 30-1 at 24. The problem with that argument is that it flies in the face of the plain text of the remedy provision on which the renters rely. That section says a "tenant may commence a civil action in the Superior Court of the District of Columbia to *enforce any rule or decision issued* under this subchapter." D.C. Code § 42-3502.18 (emphasis added). The renters are not, however, trying to "enforce any rule or decision issued under" the subchapter. *Id.* They are trying to enforce a provision *of* the subchapter—section 11a.

The renters hardly grapple with this problem. *See* ECF 30-1 at 23 n.7 (waving it away in a conclusory footnote). Their answer seems to be that the remedy provision must allow renters to enforce the statute because there is another provision that provides for judicial review of "decision[s] of the Rental Housing Commission." *Id.* at 24 (citing D.C. Code § 42-3502.19). That argument misconstrues the real work the remedy provision is doing. The judicial review provision allows parties to challenge a decision of, or inaction by, the Rental Housing Commission or Rent Administrator. *See* D.C. Code § 42-3502.19. Once the "underlying merits" of the issue have been resolved through the administrative proceeding and eventual judicial review, the remedy provision allows a tenant to "enforce" the "final decision" that was reached after judicial review. *Strand v. Frenkel*, 500 A.2d 1368, 1373 (D.C. 1985); D.C. Code § 42-3502.18. That latter power—the one

---

*Johnson v. District of Columbia*, 368 F. Supp. 2d 30, 42 (D.D.C. 2005) (discussing "question" of whether an "exhaustion requirement" that is "surely jurisdictional with respect to D.C. Courts" can be "jurisdictional with respect to the federal courts"). Fortunately, the Court need not and therefore does not decide whether D.C.'s vesting of "primary jurisdiction" in the Rent Administrator and Rental Housing Commission affects this Court's subject matter jurisdiction. Because the Court is dismissing this count on the "threshold ground[]" that the renters had to bring their claim before those administrative agencies rather than this Court, there is no need to "address[]" whether that requirement is "jurisdiction[al]." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).

actually provided by the remedy provision—is crucial, too, because "unlike a trial court, the [Rental Housing Commission] has no authority to enforce its decisions." *Strand*, 500 A.2d at 1373 n.9. "[I]f enforcement is necessary," the Commission, Rent Administrator, or "any affected housing provider or tenant" "must go to court." *Id.*; D.C. Code § 42-3502.18. It is the remedy provision that enables them to do so.

The renters' second argument for their direct enforcement of the Rental Housing Act without resort to its administrative scheme is to dismiss the on-point Court of Appeals' decisions as overtaken by amendments to the Act. The renters are correct that the first decision holding that the Rent Administrator and Rental Housing Commission have primary jurisdiction over claims under the Rental Housing Act was decided when a prior version of the Act was in effect. *See Drayton*, 462 A.2d at 1119 (noting that the Rental Housing Act of 1977 "was in effect at times pertinent to this case"); Act of July 17, 1985, No. 6-10, 32 D.C. Reg. 3089 (current version).

But in *Strand v. Frankel*, the D.C. Court of Appeals reaffirmed this understanding of the administrative review scheme, explaining that a party who starts in the administrative forum can then use the judicial review provision to seek a final decision related to "liability for rental overcharges," before using the remedy provision to bring "a later court action . . . to enforce a finally adjudicated liability for those overcharges." 500 A.2d at 1373. True, *Strand* was interpreting a 1980 version of the Act, not the present version that was enacted in 1985. *See id.* at 1370. But the relevant text of the remedy provision—the one that the renters insist allows them to bring this suit—was identical between the 1980 versions and the 1985 version that is still in effect. *Compare id.* at 1370 n.3, *with* D.C. Code § 42-3502.18. Interpreting that text—the current text— the D.C. Court of Appeals explained that the remedy provision allows "enforcement effort[s]" *after* "the underlying merits" are resolved, not before, when the enforcement suit "would be

premature." *Strand*, 500 A.2d at 1373. And for good measure, the Court of Appeals has adhered to this understanding of the administrative review scheme even since the 1985 version of the law was enacted. *See, e.g.*, *Mullin v. N Street Follies Ltd. P'ship*, 712 A.2d 487, 492 (D.C. 1998); *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 306–07 (D.C. 2006).

The renters' final attempt to justify their invocation of a cause of action under the Rental Housing Act is their argument that they could not "challenge a mandatory fee" allegedly imposed under section 11a—the claim they are making here—through the administrative process. ECF 30-1 at 26. Although no D.C. court has seemingly addressed that issue, this Court's "predict[ion]" is that the D.C. Court of Appeals would allow the renters to press their section 11a claim before the Rent Administrator and Rental Housing Commission. *Osinubepi-Alao v. Plainview Fin. Servs., Ltd.*, 44 F. Supp. 3d 84, 92 (D.D.C. 2014) (describing a federal court's task when "making an Erie-guess"). For one, section 11a expressly provides that a "housing provider who violates [the] section shall be liable to [a] tenant for treble damages pursuant to" a penalty provision found elsewhere in the Rental Housing Act. D.C. Code § 42-3502.11a. That penalty provision, however, does not address the procedures used for alleging a violation of the Act before the Rent Administrator or Rental Housing Commission. *See id.* § 42-3509.01. The necessary inference is that section 11a contemplates that one of the Act's existing remedial procedures will be available to a tenant seeking to collect their treble damages.

The Housing Commission's regulations reinforce that intuition, confirming that a "tenant of a rental unit covered by the Rent Stabilization Program" can "fil[e] a petition with the Rent Administrator" to "contest the rent for a rental unit" for myriad reasons. D.C. Mun. Regs. Tit. 14, § 4214.1; *see also Nelson v. D.C. Rental Housing Comm'n*, 184 A.3d 864, 866 (D.C. 2018) (explaining that D.C. Court of Appeals "will defer to the Commission's" reasonable

"interpretation[s] of the statutes it administers"). And the Rental Housing Act makes clear that the Rent Administrator and Commission have "jurisdiction over . . . complaints and petitions arising under" the rent stabilized housing subchapter where section 11a is codified. D.C. Code § 42-3502.04(c); *id.* § 42-3502.02(a)(2) (describing Commission's jurisdiction). Together, the Rental Housing Act's express provision of treble damages for violations of section 11a, its expansive grant of jurisdiction to the Rent Administrator and Rental Housing Commission, and its implementing regulations give the Court confidence that the renters could bring their claim under section 11a before the administrative bodies. What the Rental Housing Act does not provide, however, is a cause of action to bring this section 11a claim directly in a court without any resort to the agencies first.

## C. The renters have stated a claim under the Consumer Protection Procedures Act.

The renters' claims in count two of their complaint fall into three categories. The first two of those categories both turn on the renters' claim that the Consumer Protection Procedures Act makes it an "unlawful trade practice to violate *other* statutes." ECF 24 ¶ 67 (emphasis added). The renters say the defendants violated two other statutes—section 11a of the Rental Housing Act, and another D.C. law that "prohibits a person from selling insurance without a license to do so"—and that those violations are therefore per se violations of the CPPA. *Id.* The third category of CPPA claims in the complaint focus on a swath of allegedly misleading misrepresentations or omissions made by the defendants. *See id.* ¶ 68. The Court concludes that the first two of the CPPA claims are plausible as against Bloom and Columbia but not Second Nature and QBE. The misrepresentation and omission claims survive against all of the defendants. The Court does, however, hold that certain of the challenged statements are not actionable.

18

1.  **The renters have plausibly alleged that by violating section 11a, Columbia and Bloom—but not Second Nature and QBE—violated the CPPA.**

The renters' first theory under the CPPA nests count one of their complaint into a CPPA violation. By "impos[ing]" a "mandatory fee for a[] service" that was not "approved," the defendants violated section 11a of the Rental Housing Act. D.C. Code § 42-3501.11a; *see* ECF 24 ¶ 67. That, in turn, violates the CPPA, which allows any "consumer" to "bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(A); *see* ECF 30-1 at 46. While the renters lacked a cause of action to bring their section 11a claim directly under the Rental Housing Act, *see supra* III.B, the Court agrees that the CPPA provides them an avenue for bringing that claim to court. And although the complaint does not plausibly allege that either of Second Nature or QBE violated section 11a, it does plausibly allege that violation as to Bloom and Columbia.

Consider first whether a violation of section 11a is cognizable as a violation of the CPPA. "A main purpose of the CPPA is to assure that a just mechanism exists to remedy *all* improper trade practices." *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003). So although the "CPPA enumerates a number of specific unlawful trade practices," the Act's "enumeration is not exclusive." *Id.* Crucially for the renters' purposes, "the CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices" expressly "proscribed" by the Act, "but to all other statutory . . . prohibitions." *Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325–26 (D.C. 1999). Violating section 11a of the Rental Housing Act's statutory prohibition on imposing certain "mandatory fee[s]" would seem to easily qualify as an unlawful trade practice under the CPPA, then. D.C. Code § 42-3502.11a.

The defendants, however, argue that "violations of other statutes rarely constitute an unfair trade practice in violation of the CPPA." ECF 27-1 at 29; *see also* ECF 28-1 at 28. That argument

19

is surprising, given the decisions cited above unequivocally holding that violations of other statutes do constitute unfair trade practices. *See also Hettinger v. Bozzuto Mgmt. Co.*, No. 23-cv-3687, 2025 WL 2029747, at *2 (D.D.C. July 21, 2025) (collecting cases holding that "violating another law or regulation in the context of a consumer transaction constitutes a *per se* violation of the CPPA"). The decision Second Nature cites in support of their surprising assertion is one from this District that not only does not say "violations of other statutes rarely constitute an unfair trade practice," ECF 27-1 at 29, but in reality says the opposite: "[T]he CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices" expressly "proscribed" by the Act, "but to all other statutory and common law prohibitions," *Mann v. Bahi*, 251 F. Supp. 3d 112, 121 (D.D.C. 2017); *see* ECF 27-1 at 29 (citing *Mann*, 251 F. Supp. 3d at 121).

The defendants do make an argument that has a bit more intuitive force. Second Nature argues that allowing the renters to bring their section 11a claim via the CPPA would allow them to "circumvent" the Rental Housing Act's administrative review scheme and "undermine" the D.C. Council's "intent to have those claims adjudicated by the Rent Administrator and Rental Housing Commission in the first instance." ECF 27-1 at 30. And as the Court has already explained, it is true that the Rental Housing Act's administrative review scheme ensures those agencies generally get a first pass at adjudicating claims brought under the Act.

But rather than inappropriate "circumvent[ion]," ECF 27-1 at 30, that outcome is a result of the CPPA's "language reflecting a desire . . . on the part of the Council to allow suits of this type to be brought in the Superior Court [even] when" the Rent Administrator and Rental Housing Commission have "primary jurisdiction" over the underlying substantive claims nested into the CPPA claim. *Am. Fed'n of Gov't Empls.*, 942 A.2d at 1113. That language includes not only the CPPA's guarantee that a "consumer [can] bring an action seeking relief from the use of a trade

practice in violation of a law of the District," but its crystal-clear mandate that the "right of action established" by that guarantee will "apply to trade practices arising from landlord-tenant relations." D.C. Code § 28-3905(k)(1)(A), (6). Following that mandate, the Superior Court and courts in this District applying D.C. law have held that CPPA claims can be "based on . . . violations" of "the Rental Housing Act." *Hettinger*, 2025 WL 2029747, at \*2; *see also Equal Rts. Ctr. v. Vesta Corp.*, 2024 D.C. Super. LEXIS 44, at \*13–15 (D.C. Super. Ct. Sept. 19, 2024). And the D.C. Court of Appeals, for its part, has made clear that the "CPPA may be used even when other laws provide different enforcement procedures and mechanisms." *Atwater v. D.C. Dep't of Consumer & Regul. Affs.*, 566 A.2d 462, 467 (D.C. 1989) (discussing D.C Code § 28-3905(l), which addresses Department of Licensing and Consumer Protection's authority to adjudicate "complaint[s]" that may also "be governed in whole or in part by another law which has different enforcement procedures").

This interpretation does not deprive the Rent Administrator and Rental Housing Commission of their primary role in interpreting the Rental Housing Act, either. Disputes about the Rental Housing Act regularly arise outside of CPPA claims—most obviously, in eviction proceedings. In those proceedings, the D.C. Court of Appeals has made clear that courts should "stay the proceeding[s]" so that the administrative bodies can take the first pass at questions arising under the Rental Housing Act. *Akassy*, 891 A.2d at 296. Heeding the CPPA's direct instruction to "apply" the "right of action established" by the Act to "trade practices arising from landlord-tenant relations" still leaves plenty of room for the Rent Administrator and Rental Housing Commission to do the heavy lifting in the mine run of landlord-tenant disputes. D.C. Code § 28-3905(k)(6).

The defendants' reliance on *Gomez v. Independence Management of Delaware, Inc.*, 967 A.2d 1276 (D.C. 2009), is misplaced, as well. *See* ECF 27-1 at 30. The D.C. Court of Appeals

"indeed held" in *Gomez* "that the CPPA did not cover an action brought under the D.C. Rental Housing Conversion and Sales Act, reasoning that the D.C. Council 'did not intend . . . to extend the private right of action created by the CPPA into the realm of landlord-tenant relations.'" *Hettinger*, 2025 WL 2029747, at \*9 (quoting *Gomez*, 967 A.2d at 1286). But "the D.C. Council subsequently repudiated that understanding in 2018 when it clarified that the CPPA 'shall apply to trade practices arising from landlord-tenant relations.'" *Id.* (quoting D.C. Code § 28-3905(k)(6)). A violation of section 11a of the Rental Housing Act is therefore redressable via the CPPA.

That leaves the question of whether the complaint plausibly alleges the defendants violated section 11a. The Court has little trouble concluding that the answer is yes as to Bloom and Columbia. The complaint alleges that Bloom and Columbia provided the renters with "no information" about the cost of the Resident Benefits Package yet charged them a monthly fee for the package. ECF 24 ¶¶ 39–44. That gives rise to the plausible inference the fee was "mandatory" and was charged for the "service[s]" included in the Resident Benefits Package. D.C. Code § 42-3502.11a. Because no one suggests the fee was "approved pursuant" to the procedures outlined in the rent stabilization statutes, *id.*, the complaint plausibly alleges that Bloom and Columbia violated section 11a.

Bloom and Columbia make three unsuccessful attempts to avoid that conclusion. First, they attached to their motion to dismiss an "Exemption Statement" filed by the property's owner that they say proves the property was exempt from section 11a's coverage. ECF 26 at 21–22, 36–41. But even if the Court can take judicial notice of that document as a public record, it does not establish that the property is exempt. As the renters rightly point out, the section of the form where the owner is supposed to "check the applicable box(es)" if they are claiming the "unit . . . is

22

exempt" is blank. ECF 26 at 37–38; *see* ECF 30-1 at 29–30. The Court therefore takes as true the renters' allegation that the property was not exempt. ECF 24 ¶ 22. The factual and legal questions that will ultimately need to be resolved to determine whether that is right are not for the Court to decide at this stage.

Bloom and Columbia's second and third arguments are no more successful. They insist that they have not violated section 11a because the fee they imposed does not "fall within the definition of 'rent charged'" under the Rental Housing Act. ECF 26 at 17–18. But section 11a does not use the words "rent charged." Instead, it prohibits the imposition of "a mandatory fee." D.C. Code § 42-3502.11a. Bloom and Columbia have offered no basis for the Court to impose the atextual requirement that the fee satisfy the Act's definition of "rent charged" to come within section 11a. Same goes for their final argument, that section 11a only "prohibits landlords from imposing mandatory fees to cover services which are not part of an existing lease." ECF 26 at 19. The theory there seems to be that section 11a does not apply at all to a renter signing a new lease. Once again, nothing in the provision's text supports that view: it applies to all "mandatory fee[s]," not only those imposed on existing tenants. D.C. Code. § 42-3502.11a.

Although the complaint does plausibly allege that Bloom and Columbia violated section 11a, the same cannot be said for Second Nature and QBE. Those defendants offer several reasons why they cannot be held liable, but the Court only need address one of them because it is dispositive: The complaint nowhere alleges that Second Nature or QBE "impose[d]" any "fee" on the renters. D.C. Code § 42-3502.11a. Instead, it alleges that Columbia "collected money from" the renters "through charging mandatory fees for the Resident Benefits Package" and "then remitted the money charged from the fees to QBE and Second Nature." ECF 24 ¶ 23. True, the complaint alleges that "Second Nature instructs its property managers"—the ones it convinces to

23

sell the Resident Benefits Package—"to give the tenant *no option* by making the fee mandatory." *Id.* ¶ 29. But that urging does not in and of itself constitute the "impos[ition]" of a fee, D.C. Code § 42-3502.11a, as the complaint itself recognizes through its allegation that after Columbia and Bloom "bought into" Second Nature's program, Columbia and Bloom "require[d] that all tenants at each of the properties they manage pay [the] mandatory monthly fee" for the Resident Benefits Package. ECF 24 ¶¶ 33–34. In other words, the complaint alleges Columbia and Bloom—not Second Nature or QBE—imposed the fee. The complaint therefore does not plausibly allege that Second Nature or QBE violated section 11a.

The renters did not respond to this argument in their opposition to the motions to dismiss. *See* ECF 30-1 at 46 n.16 (acknowledging this argument but failing to respond); *see also Kim v. Fin. Indus. Regul. Auth., Inc.*, 698 F. Supp. 3d 147, 168 (D.D.C. 2023) (noting that a court can "treat" an argument "a party fails to counter . . . as conceded"). Instead, the renters devoted their attention to their argument that QBE and Second Nature can be held liable for Bloom and Columbia's actions either via "vicarious liability" or because all of the defendants were part of a joint venture. ECF 30-1 at 37–39. But despite the renters' efforts, they cannot hold Second Nature or QBE liable for Bloom and Columbia's imposition of the fee. Even assuming that section 11a would apply to Second Nature or QBE if they were either in a joint venture or agency relationship, the complaint fails to plausibly allege either of those theories.[5]

As for an agency relationship, the complaint repeatedly alleges that QBE and Second Nature are "agents of Columbia." ECF 24 ¶ 63; *see also id.* ¶¶ 15–17, 23. "Vicarious liability," however, is a way of "transfer[ring] liability from an agent to a principal." *Agomo v. Fenty*, 916 A.2d 181, 192 (D.C. 2007). In trying to transfer liability from the "supposed principal"—

---

[5] Although the complaint makes mention of "aiding and abetting," ECF 24 ¶ 63, the renters have expressly disavowed that theory, *see* ECF 30 at 37 ("Plaintiffs do not allege 'aiding and abetting' liability.").

24

Columbia and Bloom—to the "supposed agent[s]"—Second Nature and QBE—the renters are requesting a "great departure from the well-established body of law on agency." *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 1, 12 (D.D.C. 2013) (K.B. Jackson, J.) (citing Restatement (Third) of Agency § 7.03 cmt. b (2006)). Because the renters have not offered the Court a single reason to think that novel rule applies under D.C. law, the Court declines their invitation to innovate. And although the complaint offers a lone conclusory legal assertion that QBE was *also* the principal, with Second Nature and Columbia acting as its "agents," ECF 24 ¶ 69, there are no factual allegations suggesting QBE had "the right to control and direct" anything Second Nature or Columbia were doing, *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000).

The renters' joint venture theory fares no better. To establish a joint venture, the complaint needed to allege facts plausibly suggesting that QBE and Second Nature had an "equal right to direct and control" the would-be venture. *Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 578 (D.C. 2011) (describing that right as "necessary" and "key" to establishing a joint venture). Faced with the defendants' argument that the complaint is devoid of any allegations supporting that conclusion, the renters pointed to paragraph 21 of the complaint. ECF 30 at 38. That paragraph does allege that "[e]ach" defendant "had an equal right to control the manner in which the joint venture operated, including without limitation, providing so-called 'Renter's Insurance' as one of the purported benefits to tenants, billing a monthly mandatory fee to the tenants, and determining which properties were eligible to be included under the Master [Insurance] Policy" at QBE. ECF 24 ¶ 21. That the defendants had an "equal right to control," however, is a legal conclusion that the Court is not obligated to "accept as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And that the defendants sold various services that were then bundled together as part of the Resident Benefits Package does not suggest anything about a shared right

25

to control, either. Same goes for the renters' allegation that "[e]ach of the [d]efendants profited from the mandatory monthly fee charged for the 'Resident Benefits Package.'" ECF 24 ¶ 21. "The mere sharing of profits" is not sufficient to establish a joint venture. *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 83 (D.C. 2017). Because the renters have not plausibly alleged any theory under which Second Nature or QBE could be held liable for Columbia and Bloom's imposition of the mandatory fee, they have not stated a claim against Second Nature or QBE for a violation of section 11a.

### 2. The renters have plausibly alleged that Columbia and Bloom—but not Second Nature and QBE—sold insurance without a license and therefore violated the CPPA.

The renters also allege that the defendants violated a D.C. statute prohibiting the unlicensed sale of insurance and thereby violated the CPPA. No different than with the CPPA claim that turns on the alleged violation of section 11a, the alleged violation of the insurance statute's "prohibition[]" can constitute a violation of the CPPA. *Osbourne*, 727 A.2d at 326.

The relevant statute provides that a "person shall not sell, solicit, or negotiate insurance in the District . . . unless the person is licensed." D.C. Code § 31-1131.03(a). The complaint plausibly alleges that Bloom and Columbia violated that provision. Bloom and Columbia "enrolled" the renters in the Resident Benefits Package. ECF 24 ¶ 6. One part of that package was the "renter's insurance." *Id.* ¶ 34. Bloom and Columbia then charged the renters "a mandatory monthly fee" for the package. *Id.* ¶ 42. Because the complaint alleges that Bloom and Columbia marketed and received money for the insurance, it plausibly alleges they "s[o]l[d]" the insurance. D.C. Code § 31-1131.03(a); *see, e.g.*, Sell, Merriam-Webster's Collegiate Dictionary 1129 (11th ed. 2014) ("to give up (property) to another for something of value (as money)" or "to offer for sale"); Sell, Webster's New World College Dictionary (5th ed. 2018) 1319–20 ("to give up, deliver, or

26

exchange (property, goods, services, etc.) for money or its equivalent"). And the complaint alleges they did so without a license, *see* ECF 24 ¶ 48, thereby violating the statute.

As for Second Nature and QBE, the claim fails because both of those businesses *are* licensed to sell insurance. Second Nature attached its license to its motion to dismiss, *see* ECF 27-4, and because it is a "public record[] . . . available from [a] reliable source[]"—the National Association of Insurance Commissioners—the Court can take judicial notice of that document, *Abdus-Sabur v. Hope Vill., Inc.*, 221 F. Supp. 3d 3, 10 n.3 (D.D.C. 2016). And the complaint never alleges that QBE is unlicensed. *See* ECF 24 ¶ 67 (alleging only that Second Nature, Columbia, and Bloom were unlicensed). For the same reasons the joint venture and vicarious liability theories failed when it came to the section 11a claim, the renters cannot hold QBE and Second Nature liable for Columbia and Bloom's alleged violations of the insurance statute, either.

3.  **The renters have plausibly alleged that the defendants made several misleading statements or omissions, but some of the challenged statements are not actionable.**

Finally, the renters allege that the defendants made many misleading statements and omissions in the course of enrolling them in the Resident Benefits Package. As the Court has already explained, the renters lack standing to challenge any statements that were made on Second Nature's website. *See supra* 12–13. That knocks out one of the allegedly misleading statements. *See* ECF 24 ¶ 68(b). But the renters do have standing to challenge the alleged misstatements that were made in the flyer they received and in the property listing, *see id.* ¶¶ 34, 38, as well as the many alleged omissions, *see id.* ¶¶ 68(o)–(s), 70(b).

The CPPA makes it unlawful to "misrepresent . . . a material fact which has a tendency to mislead" or "fail to state a material fact if such failure tends to mislead." D.C. Code § 28-3904(e),

(f).[6] "[A] plaintiff need not allege or prove intentional misrepresentation or intentional failure to disclose to prevail on a claimed violation of" those two statutory prohibitions. *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013). The question is how the alleged misrepresentations or omissions "would be viewed and understood by a reasonable consumer." *Id.* That "reasonable consumer" standard applies both to the inquiry of whether the statement or omission would have the "tendency to mislead" and to whether the statement or omission was "material." *Id.* Those two elements of the claim—materiality and the tendency to mislead—are both "generally . . . question[s] for the jury." *Mann*, 251 F. Supp. 3d at 126.

Under those standards, the renters have stated a claim against all of the defendants that some of their statements or omissions were material and misleading. The renters allege that the flyer—which was evidently created by Second Nature and distributed by Columbia and Bloom— misrepresented the nature of the insurance policy by calling it "renter's insurance" when it was principally a policy that protected the property manager and landlord and inaccurately promised the renters home-delivery of new HVAC filters that were never, in fact, delivered. *See* ECF 24 ¶¶ 68(a), (m)–(n); *see also id.* ¶ 28(a) (alleging renters were never provided HVAC filters); *id.* ¶ 28(f) & n.4 (identifying Second Nature and Columbia as the "publishe[rs]" of the flyer). So too does the complaint plausibly allege that all three defendants failed to "state" several "material fact[s]" which had the tendency to mislead the renters. D.C. Code § 28-3905(f). The complaint alleges that Columbia failed to provide the renters with a copy of an addendum to the lease that apparently described the terms of the insurance the renters were purchasing, that all of the defendants failed to "disclose the terms of the 'Renter's Insurance' to the tenants" or to provide

---

[6] The renters also rely on other subsections of the CPPA defining "unfair or deceptive trade practice[s]." D.C. Code § 28-3904; *see* ECF 24 ¶¶ 72–76. But those allegations focus on the same statements or omissions that the complaint alleges ran afoul of subsections (e) and (f). *Compare, e.g.*, ECF 24 ¶ 75, *with id.* ¶ 68(p). The Court therefore focuses its attention on subsections (e) and (f).

the tenants with a copy of the policy, and that the defendants failed to disclose that Columbia was not licensed to sell insurance. *See* ECF 24 ¶¶ 41, 68(o)–(q), (s).

Responding to these allegations, the defendants argue that their statements regarding the insurance policy were true, because the flyer promised that renters would be "added to [the] master policy" and the renters were added to the master policy. ECF 24 ¶ 38; *see* ECF 26 at 26; ECF 27-1 at 33–34; ECF 28-1 at 33. But the CPPA's prohibition "extends beyond literal falsehoods and includes any omissions, innuendos, or ambiguities that have a tendency to mislead reasonable consumers." *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 664 (D.C. 2024); *see also Hettinger*, 2025 WL 2029747, at *10. A jury could decide that by calling the insurance offering "renter's insurance," Columbia, Bloom, and Second Nature were conveying a message to the renters about the nature of what they were purchasing: insurance to protect themselves. Because the policy the renters were paying for provided far more coverage for the property manager and landlord than the renters, a reasonable consumer might understandably feel misled.

As for Columbia and Bloom's failure to provide the lease addendum that apparently described the insurance, Second Nature attached an exhibit to its motion that purportedly shows the renters' signature on that addendum. *See* ECF 27-2 at 18; ECF 27-1 at 8 (explaining this exhibit). The renters, however, unambiguously allege that they did not receive that addendum when they signed the lease. *See* ECF 24 ¶¶ 41–42. In this posture, that creates a factual dispute that cannot be resolved on a motion to dismiss. *Cf. Saucier*, 64 A.3d at 442 (describing "presumption" that arises when a person's signature is on a document that they received the document but noting that the "presumption" can be rebutted on summary judgment via a "sworn affidavit"). And because at this stage the Court assumes the addendum was not part of the lease,

the renters' related allegation that the flyer misled the renters into believing they were "required . . . to provide insurance for the landlord" is plausible, too. ECF 24 ¶ 68(l).

Nor can QBE avoid liability for its alleged failure to provide the policy to the renters by arguing it was under no "obligat[ion] to disclose" information about the policy. ECF 28-1 at 33. The provision of the CPPA that prohibits misleading omissions "does not require a plaintiff to plead and to prove a duty to disclose information." *Saucier*, 64 A.3d at 444. All that is required is "that the omitted information is material and has a tendency to mislead." *Id.* The renters' allegation is that QBE failed to provide them with, among other things, the policy coverage limits. *See* ECF 24 ¶ 70(b). The complaint therefore plausibly alleges that QBE misled the renters via its omissions.

While the statements and omissions discussed above are plausibly alleged to have violated the CPPA, the smattering of other statements challenged in the complaint fail as a matter of law. The renters allege that in several ways the flyer deceptively suggested that the Resident Benefits Package provided "benefit[s]" and "value" to consumers. *See* ECF 24 ¶¶ 68(c)–(d), (f)–(h), (k). But the flyer does not actually use the word "benefits" or "value" in the way the complaint alleges. It does not say, for instance, that the "Resident Rewards Program" "had value to tenants." *Compare id.* ¶ 68(h), *with id.* ¶ 38. Because the renters have not alleged any particular misleading statement in these claims, the Court dismisses them.

The same goes for the renters' allegation that the testimonial statement at the top of the flyer—"I'm getting way more out of renting than I ever did before"—was false. *Id.* ¶ 68(j). The renters' theory is that the "I" in that statement was a renter in a Columbia property, *see id.* ¶ 39, but no reasonable consumer would draw that conclusion given the statement's position on the flyer right above a note that there were "over 15,000 5-star reviews." *Id.* ¶ 38. The "I" was a renter in a

property selling Second Nature's "Resident Benefits Package," and the complaint does not allege that there was no such renter who made the statement. The renters have similarly failed to plausibly allege that the flyer's statements about the credit building report were misleading and have not pointed the Court to anywhere that the defendants told the renters they were allowed to impose a mandatory fee. *See id.* ¶¶ 68(e), (i). And finally, Second Nature was licensed to sell insurance, so did not need to tell the renters otherwise. *Compare* ECF 24 ¶ 68(r), *with* ECF 27-4 at 2.

Some of the CPPA claims alleging misleading statements or omissions survive, then, while others do not. That brings the Court to one last loose end that the renters raised in their opposition. The renters argue that under Rule 12(b)(6), "once a court determines that a claim states a viable basis for relief"—and by claim, the renters seemingly mean count of their complaint—the court "cannot further parse out whether portions of the claim would suffice on their own." ECF 30-1 at 49. That is an interesting argument that has been endorsed in a thoughtful opinion from another court in this District. *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 59–60 (D.D.C. 2022). "There appears," however, "to be some disagreement among the federal courts" about this issue, with some concluding Rule 12 "permits a district court to dismiss a portion of a claim (i.e., a theory of liability)" and others holding that "Rule 12 permits only dismissal of a claim *in toto*." *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, 605 F. Supp. 3d 157, 160 n.1 (D.D.C. 2022). That dispute appears to be largely academic. Even courts that take the latter path exercise their "considerable discretion over discovery matters" to preclude discovery into aspects of a count that fail as a matter of law. *FTC*, 581 F. Supp. 3d at 61. It therefore makes no difference if the Court dismisses the implausible claims that are folded into count two now—as the Court will do—or waits until summary judgment to resolve them. *See id.* at 60 (identifying partial summary judgment as the method for disposing of failed aspects of claims).

*    *    *

Defendants' motions to dismiss for failure to state a claim, ECF 26, ECF 27, ECF 28, are

**GRANTED IN PART** and **DENIED IN PART**.

    **SO ORDERED.**

                                    _____

                                    JIA M. COBB
                                    United States District Judge

Date: March 31, 2026